IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF KANSAS

KRISTOPHER JOSEPH and
MICHELLE ANN KOWALSKY,

                    Plaintiffs,

       Vs.                                              No.  10-1222-SAC

S & J OPERATING COMPANY,

                    Defendant.


MEMORANDUM AND ORDER

          For the damage and injuries caused by subsidence and by a sink

hole near their home, the plaintiff landowners pursue as their remaining

claim--trespass against the defendant operating company for removal of

subjacent support related to its use and/or plugging of a salt water disposal

well.  In its prior order, the court held that the statute of repose barred the

plaintiffs' nuisance claims but that the plaintiffs were entitled to amend the

pretrial order and add a claim for trespass by subsidence (Dk. 46).  The

defendant operating company now seeks summary judgment because this

tort action accrued with the prior landowner and was not assignable to the

plaintiffs under Kansas law and because there is no evidence of the

defendant engaging intentional or purposeful conduct that caused the

removal of subjacent support.  Being as how the defendant prevails on the

first issue, the court grants the defendant's motion without addressing the

second issue.

**SUMMARY JUDGMENT STANDARD**

Rule 56 authorizes judgment without trial "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2).  Substantive law governs the elements of a given claim or defense and reveals what issues are to be determined and what facts are material.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A material fact is one which would affect the outcome of the claim or defense under the governing law.  *Id.*  "[T]he dispute about a material fact is 'genuine,' . . ., if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

On summary judgment, the initial burden is with the movant to point out the portions of the record which show that the movant is entitled to judgment as a matter of law.  *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992), *cert. denied*, 506 U.S. 1013 (1992). Instead of disproving a claim or defense, the movant need only show "a lack of evidence" on an essential element.  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).  If the movant meets that burden, the non-movant must come forward with specific facts based on admissible evidence from which a rational fact finder could find in the non-movant's

2

favor.  *Id*.   The non-movant's "burden to respond arises only if the" movant meets its initial burden of production.  *Neal v. Lewis*, 414 F.3d 1244, 1248 (10th Cir. 2005) (citation omitted).  The essential inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether the evidence is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. at 251–52.  Put another way, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *See Pinkerton v. Colorado Dept. of Transp.*, 563 F.3d 1052, 1058 (10th Cir. 2009).

**STATEMENT OF FACT**

By deed dated September 28, 2007, the plaintiffs received from Kristopher Kowlasky's mother a quarter section of land in Barton County, Kansas, ("plaintiffs' property") on which was located the Kowalsky 8SWDW, an oil and gas saltwater disposal well drilled in August of 1944.  Salt water brine from local oil and gas production was disposed through this well into the Arbuckle formation approximately 3400 to 3819 feet below the surface.

In April of 1985, the defendant S & J Operating Company ("S & J") purchased and was assigned the oil and gas lease to the plaintiffs' property that included the disposal well, Kowalsky 8SWDW.  After the well

3

failed a mechanical integrity test, S & J plugged it in a manner approved by the Kansas Corporation Commission ("KCC") in October of 1989.  S & J sold and assigned this oil and gas lease to Davis Petroleum in November of 1989.

In 2005, the plaintiff Kristopher Kowalsky noticed that the tree pile in the pasture seemed lower in the horizon, and he talked with his wife "that it just doesn't look right out there."  (Dk. 57-1, Kristopher Kowalsky Dep., p. 28).[1]  Around the same time, Kowalsky spoke with his neighbor, Tim Wornkey, that "it just seemed like ground was disappearing" in the area of the disposal well.  *Id.* at 26-27.  Wornkey agreed with Kowalsky that the land seemed to be dropping and offered to contact a friend, Tim Dickinson, who had worked at the site when the disposal well was plugged.  *Id.* at pp. 25, 27.  On behalf of Kowalsky, Dickinson later contacted the KCC which sent an agent to inspect the pasture site on April 18 and April 20 of 2005. (Dk. 56-13).

On April 20, Kowalsky told the KCC agent about observing several changes to his property that concerned him.  First, the water level in the irrigation well near his house had dropped 12 feet in the last three years. (Dk. 57-1, Kristopher Kowalsky Dep. pp. 29-30).  His house and outbuildings were settling towards the disposal well site.  *Id.* at 30.  He said that his

---

[1]In her deposition, Michelle Kowalsky stated she probably noticed the subsidence in the pasture before her husband Kris because she checked the cattle.  (Dk. 57-1, Michelle Kowalsky Dep. p. 9).  She noticed the subsidence before the KCC was contacted.  *Id.* at 11.

neighbor's home also was settling toward the site. *Id*. at 34. He told the agent that "the hole had dropped another foot" since the agent's first inspection. *Id*. at 35. Finally, he told the agent that he "had not said anything earlier" about the "possible low spot" because he did not want to anger the lease operator and prospective business venturer. (Dk. 56-13, p. 2).

In his deposition, Kowalsky was asked about his comments to the agent and explained them. With respect to the drop in his water well, Kowalsky added that he had to drill deeper. (Dk. 57-1, Kristopher Kowalsky Dep. at p. 29). As for the settling comment, Kowalsky answered:

> It's kind of hard to describe it. When you live some place every day years after years after years and then you start seeing these little subtle changes but they're not significant enough that you can actually pick out one particular reason that it's occurring, but it just seems like everything is shifting, and that's the conversation. I don't think I specifically told him the house is falling this way or this way. I was saying that it just seems like things are beginning to settle towards that direction. I guess if that is a good explanation or if that's what you're asking me or if I even answered it.

*Id*. at 31. Kowalsky went on to describe that small cracks had appeared in the southwest quarter of the house and that the sidewalks next to the house were settling:

> You know, when Dad poured that concrete out there, it was a big deal because . . . me and my sister put our handprints in it and we bragged for years about how nice that concrete pad was and how straight it was and how straight the sidewalk was, my dad was real meticulous, and all of a sudden the sidewalk started buckling and cracking and the side of the house started cracking and it just seemed unusual.

*Id.* at 32.  The cracks were "larger than hairline" but "not as big as quarter-inch" and seemed to be "new" and the result of "settling."  *Id.* at 33. Regarding the comment of settling at his neighbor's place, when asked if there were cracks in the neighbor's house or sidewalk like at his home, Kowalsky answered:

> I don't think there was *anything significant* like that.  You know, it's a large area.  It just seems like the whole area--in front of Tim's house where the road leaves the bridge, the road was constantly wet and it had never been wet before, and there was a dip in the road that had never been there before in front of Tim's house.

*Id*. at 34 (italics added).  Kowalsky was asked about his comment of the hole dropping even more in the two days separating the agent's two visits, he answered:

> Prior to that time, we really didn't know what was going on.  It just seemed like the land was shifting.  It seemed like the land was starting to drop.  Then we talked to Tim and we got started on, well, that's the location of that old saltwater disposal well that they couldn't plug.  So then we started paying more attention to a particular area and then just using personal reference points and things like that just to watch it.  Well, once we started really paying attention to the area, then we started noticing.

*Id*. at 35.  Kowalsky admitted his observations around that time caused him to think the subsidence was "getting pretty aggressive."  *Id*. at 36.  The area began holding rain runoff and then in 2008 sunk far enough that it reached the water table.  *Id*. at 36-37.  Finally, as to Kowalsky's statement that he had delayed reporting the low spot because of his concerns with the current lease operator, Kowalsky admitted he was thinking that the subsidence was

6

connected to the salt water disposal well. *Id.* at 39.

After the visit of April 20, 2005, the KCC began monitoring the

subsidence in the pasture. Kowalsky testified that in response to the KCC's

action, he did the following:

> I basically turned it over to them. You know, I reported the problem, I
> showed 'em where the problem was. No offense, but you're asking
> these questions in a manner that I was experienced at the time with
> saltwater disposal leases, who is responsible, who's not like I am now,
> and at that particular time I was completely clueless what to do, who
> to do it with or what to even say. And after several conversations with
> people that I thought were knowledgeable, it came down to you need
> to call the KCC and report it to them. So I called the KCC, reported it
> to them. They came out, they looked the situation over. They told me
> they were going to monitor it. We kind of left it at that. They told me
> what I was seeing was something that had been created before. There
> was nothing that anybody could do about it and the subsidence that
> was there now was probably all the bigger it was ever going to get and
> really wasn't too concerned about it.

*Id.* at 40-41. The KCC representatives also told Kowalsky that "[t]here was a

lot of problem plugging the well and that where the subsidence was is the

precise location of the well." *Id.* at 42. Kowalsky understood the KCC

agents were telling him the subsidence was due to problems with plugging

the saltwater disposal well. *Id.* at 42-43.

Thomas Hansen prepared a geologist report for the plaintiff, and

the report included the following discussion of the KCC records:

> Kansas Corporation Records indicate a phone call was received April
> 18, 2005, from Tim Dickinson on behalf of Kris Kowalsky concerning a
> possible sinkhole on the Kowalsky lease. KCC inspected the lease later
> that afternoon. The KCC visited the site again on April 20, 2005,
> locating the wells using a GPS and collecting water samples from the

> producing wells.  Elevation survey at the Kowalsky #8-W SWDW site
> began on May 11, 2005.  The survey point at the well has been
> covered with water since the latter part of 2006.  Before it was
> covered with water the survey point elevation had decreased 0.66
> feet.

(Dk. 56-14, p. 7).   In other words, from Hansen's report discussing the KCC

records, the KCC's monitoring showed the sink hole dropped eight additional

inches from May 2005 until late 2006.  The sink hole has continued to

expand over the years.

        The plaintiff filed this suit in the Twentieth Judicial District Court

of Barton County, Kansas, on January 29, 2010, and the defendants

removed this action to federal court after the plaintiffs stated the amount in

controversy in their monetary demand.  The amended pretrial order reflects

the plaintiffs' remaining claim is a trespass action for subsidence resulting

from the defendant's operation and attempts to plug the saltwater disposal

well.  (Dk. 54, p. 6).

**UNASSIGNABLE TRESPASS CLAIM**

        Arguing the uncontroverted facts show substantial damage to

the property by the end of April of 2005, the defendant contends the tort

action had accrued and belonged to the prior landowner and was not

assignable to the plaintiffs under Kansas law.  The plaintiffs oppose

summary judgment arguing against an actionable injury in 2005 and

contending there is a question of material fact as to when the fact of injury

became reasonably ascertainable to them.  The plaintiffs, however, do not

challenge the defendant's argument that if the trespass by subsidence action

accrued before they acquired the land on September 28, 2007, then Kansas

law precludes the assignment of this action to them.

As the defendant points out, the recognized law in Kansas is that

"[a]ny tort for damages done to" property before the plaintiff acquires the

property "belong[s] to his predecessors-in-interest and lapse[s] when they

transferred it.  In Kansas, tort claims such as those in question are

unassignable." *Morsey v. Chevron, USA, Inc.*, 94 F.3d 1470, 1478 (10th Cir.

1996) (citations omitted); *see Wade v. EMCASCO Ins. Co.*, 483 F.3d 657,

675 (10th Cir. 2007) (tort claims for fraud are unassignable in Kansas);

*Snider v. MidFirst Bank*, 42 Kan. App. 2d 265, 270-71, 211 P.3d 179 (2009)

(tort actions, including intentional tort claims like conversion, are not

assignable in Kansas).   In *Morsey*, the lease owner in a production field

sued another operator in that field for loss of oil producing capacity and for

other permanent damage caused by a water flood injection method.  While

Morsey became the lease owner after this injection method was used,

Morsey claimed "that his predecessors-in-interest assigned all of their rights

to him." 94 F.3d at 1474.[2]  Applying Kansas law, the Tenth Circuit

_____

[2]The court in *Morsey* observed the distinction between permanent and
temporary damages recognized in Kansas:
Temporary damages or continuing damages limit recovery for
injury that is intermittent and occasional and the cause of the

concluded that Morsey "cannot recover for injuries inflicted on the leasehold before he acquired it." *Id*. at 1478.  In many other jurisdictions, a tort action involving damage to real property is assignable, but in Kansas, tort claims for property damage may not be assigned.  6A C.J.S. Assignments § 51 (2012); *See Scheufler v. General Host Corp.*, 895 F. Supp. 1416, 1417-18 (D. Kan. 1995), *aff'd*, 126 F.3d 1261, 1272 (10th Cir. 1997) (landowners bringing nuisance action against the defendant plant for groundwater pollution cannot recover the sharecropping tenants' lost crop profits, and the tenants' ratification pursuant to Rule 17(a) "would have amounted to an assignment of their tort claims . . ., a result that would have violated Kansas law.").[3]  The plaintiffs' memorandum does not discuss these principles

---

> damages remediable, removable, or abatable.  Damages are awarded on the theory that cause of the injury may and will be terminated.  Temporary damages are defined as damages to real estate which are recoverable from time to time as they occur from injury.
>      Permanent damages are given on the theory that the cause of injury is fixed and that the property will always remain subject to that injury.  Permanent damages are damages for the entire injury done-- past, present, and prospective--and generally speaking those which are practically irremediable.  If an injury is permanent in character, all the damages caused thereby, whether past, present, or prospective, must be recovered in a single action.

94 F.3d at 1476 (quoting *McAlister v. Atlantic Richfield Co.*, 233 Kan. 252, 662 P.2d 1203, 1212 (1983) (citations omitted)); *see Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 473, 15 P.3d 338 (2000).  The district court held that any claim for permanent damages was barred by the statute of repose and that Morsey had failed to prove any temporary damages.  94 F.3d at 1476-77.

[3]"The sale of land with latent damage breeds a severe injustice in Kansas because tort claims available to the seller of land are not assignable

generally or challenge their application here should the court find that the

trespass by subsidence action accrued with the prior landowner.

S & J characterizes the plaintiffs' claim to "not assert <u>continuing</u>

tortious conduct," (Dk. 56, p. 9), and the plaintiffs do not dispute this

characterization.[4]  As to when this action for trespass by subsidence would

arise, the Kansas Supreme Court has held:

> Although a negligence cause of action usually runs from an act of a defendant, a trespass action need not, and often would not, run from an act of defendant.  There is no trespass until the entry is accomplished *and* the damage occurs (or has begun to occur, as in a case of continuing trespass).  The trespass counterpart of the negligence "wrongful act" is the entry and the damage.  In the present case, the entry was accomplished and the damage occurred <u>when the surface fell</u>.
> . . . Here, the "act giving rise to the cause of action" was the <u>subsidence of the surface</u> and not the mining operations. . . .  Here, as in *Audo* [*v. Mining Co.*, 99 Kan. 454, 162 Pac. 344 (1917)], the <u>subsiding of the land</u> is the "act giving rise to the cause of action," and, since the injury to the surface was not immediately asertainable, the statute of limitations does not begin to run until it was manifest.

*Nida v. American Rock Crusher Co.*, 253 Kan. 230, 238-39, 855 P.2d 81

(1993) (underlining added); *cf. Olson v. State Highway Com'n of Kansas*,

---

with the land.  Thus, a buyer of damaged land will be claimless against the perpetrator."  Arthur E. Rhodes, *Damage to Real Property: The Lay of the Land*, 75 J. Kan. B.A. 6, 27 (Oct. 2006) (footnotes omitted).

[4]Subsidence from mining has "been said to have created a permanent change in the land so as to constitute a permanent trespass."  *Dombrowski v. Gould Electronics, Inc.*, 954 F. Supp. 1006, 1013 (M.D. Pa. 1996) (citation omitted).  The plaintiffs here claim they "have lost the entire value of their property and the property has no value."  (Dk. 57, p. 2).  Such a claim bespeaks of a permanent change or injury to the land constituting a permanent trespass.

235 Kan. 20, 26, 679 P.2d 167, 173 (1984) ("An action for permanent damages to real property shall not be deemed to accrue until 'substantial injury is reasonably ascertainable.' *Thierer v. Board of County Commissioners*, 212 Kan. 571, Syl. ¶ 2, 512 P.2d 343 (1973)."). Thus, if the surface of the land had been damaged, that is, fell or subsided, before the plaintiffs acquired it in September of 2008, then they may not now recover for this trespass by subsidence because the tort is not assignable in Kansas.

The summary judgment record shows S & J is entitled to judgment as a matter of law. A rational trier of fact considering the record as a whole could not find for the plaintiffs that an action for trespass by subsidence accrued only after September of 2008. The evidence here is so one-sided that the property's surface had appreciably subsided as to create an injury reasonably ascertainable well before that date. The record is replete with references that subsidence had occurred by April 2005. Kris Kowalsky admitted he judged the subsidence to be "pretty aggressive" in April of 2005. (Dk. 57-1, Kristopher Kowalsky Dep. p. 36). The KCC monitoring confirmed that the subsidence was continuing. Kris Kowalsky conceded that once they "started really paying attention to the area" in 2005 then they noticed the land was subsiding. *Id*. at 35. All of this was consistent with what already had been noticed by the "subtle" settling in the

buildings, the cracks in walls, the buckling and cracking sidewalks, and the new dips in the roads. *Id*. at 31. The KCC's survey point dropped eight additional inches from May of 2005 to late 2006 and was covered by water. By the end of April of 2005, the plaintiffs knew that the subsidence had occurred and was still occurring where the saltwater disposal well had been and that the KCC agents blamed the subsidence on problems with plugging the well. By the end of 2006, the subsidence was a known permanent condition of the land. There is no genuine factual dispute remaining that before the plaintiffs ever acquired this land, its surface had fallen or subsided appreciably as to result in a substantial injury that was reasonably ascertainable and to give rise to a cause of action for trespass by subsidence. Because the tort of trespass by subsidence is not assignable, the plaintiffs are without a claim against S & J.

IT IS THEREFORE ORDERED that the defendant's motion for summary judgment (Dk. 55) is granted.

Dated this lst day of May, 2012, Topeka, Kansas.


s/ Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge